# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MISSOURI
### WESTERN DIVISION

ZACHARY SMITH and
BRIAN KAGARICE, individually and on
behalf of all others similarly situated,

        Plaintiffs,

v.

TRUMAN ROAD DEVELOPMENT, LLC
d/b/a NO OTHER PUB,
THE CORDISH COMPANIES, INC.,
ENTERTAINMENT CONSULTING
INTERNATIONAL, LLC,

        Defendants.

Case No. 4:18-cv-00670-NKL

## ORDER

Pending before the Court are Plaintiff Smith's motion for class certification, Doc. 131, Plaintiffs' motion for partial summary judgment, Doc. 148, Defendants' motion for summary judgment, Doc. 145, and Defendants' motion to exclude expert testimony, Doc. 141. For the reasons stated below, Plaintiffs' motion partial summary judgment is denied. Defendants' motion for summary judgment is granted in part and denied in part. Defendants' motion to exclude expert testimony is denied. Plaintiff Smith's motion for class certification is denied.

## I. BACKGROUND[1]

Plaintiffs Zachary Smith and Brian Kagarice's Second Amended Class Action Complaint against Defendants Truman Road Development, LLC d/b/a No Other Pub ("No Other Pub"), the

---

[1] For the purposes of the summary judgment motions, all facts are viewed in the light most favorable to the nonmoving party. *Cottrell v. Am. Family Mut. Ins. Co., S.I.*, 930 F.3d 969, 971 (8th Cir. 2019).

Case 4:18-cv-00670-NKL   Document 207   Filed 04/28/20   Page 1 of 51

Cordish Companies, Inc. ("Cordish Companies"), and Entertainment Consulting International, LLC ("ECI") alleges violations of the Telephone Consumer Protection Act and its implementing regulations. *See* Doc. 54 (Second Amended Complaint). The Second Amended Complaint states that between April 25, 2014, and April 4, 2018, Plaintiffs and putative class members received text messages and phone calls that they had not consented to from Defendants advertising No Other Pub's products and services. Specifically, Plaintiffs allege the following causes of action:

- Count I (the ATDS Claim) – violations of 47 U.S.C. § 227(b)(1)(A)(iii) for using an ATDS to send text messages without consent;
- Count II (the Procedural Claim) – violations of 47 U.S.C. § 227(c) and 47 C.F.R. § 64.1200(d) for sending text messages without first implementing adequate procedures to prevent telemarketing calls or text messages to persons who request not to receive calls or text messages by that entity;
- Count III (the Do-Not-Call Claim) – violations of 47 U.S.C. § 227(c) and 47 C.F.R. § 64.1200(c)(2) for making more than one telephone solicitation to a person on the NDNCR in a twelve-month period;
- Count IV (the Revocation Claim) – violations of 47 U.S.C. § 227(c) and 47 C.F.R. § 64.1200(d)(3) for transmitting more than one advertising and/or telemarketing text message and/or telemarketing phone call within any twelve-month period after being requested to stop.[2]

Plaintiff Smith also seeks to certify a class under Count I.

No Other Pub is one of a series of drinking establishments located within the Kansas City Power & Light District, which is a retail, entertainment, office, and residential district located in downtown Kansas City, Missouri. Doc. 146-20 (Tara Knipp Declaration). As part of its promotions, No Other Pub offered contests, promotions, giveaways, and cocktail parties to individuals through text messages. *Id.* No Other Pub contends these messages were sent to its patrons who visited and voluntarily provided their contact information in order to sign-in to a happy hour or win one of these prizes or events. *Id.* Putative class members' contact

---

[2] Count IV is brought by Plaintiff Kagarice only.

information was obtained when guests submitted their information on a Paper Card or signed into a hosted happy hour on a sign-in sheet in order to receive drink specials. *Id.*; Doc. 146-21 (Sample Sign-In Sheet); Doc. 146-22 (Sample Sign-In Sheet). No Other Pub claims that upon collecting contact information, its employees manually entered the information into the bar's texting platform Txt Live and subsequently shredded the sign-in sheets or Paper Cards. Doc. 146-20.

In January 2017, Smith visited No Other Pub to attend a happy hour hosted by a friend. Doc. 146-2 (Smith Interrogatory Response). On that visit, Smith provided his contact information on a sign-in sheet in order to check-in to the happy hour, receive discounts on drinks, and enter a raffle for a free happy hour. Doc. 146-3 (Smith Deposition), pp. 128, 219. This information included his name, phone number, and birthdate. Doc. 179-21 (Smith Deposition), pp. 13–14, 177. Smith claims that an employee told him he would be contacted about winning a potential raffle that evening but did not mention the possibility of future texts. *Id.* at 127–29. Smith subsequently purchased drinks at the discounted happy hour price. Doc. 146–24 (Smith No Other Pub Transaction Record). No Other Pub's records reflect that Smith's information was entered into the Txt Live platform one week later. Doc. 146-5 (Smith Contact in Txt Live). Shortly thereafter, on February 1, 2017, a No Other Pub staff member messaged Smith informing him that he had won a happy hour party, stating "Hi Zach, This is Tara at No Other Pub. You entered to win a late night Happy Hour Party where YOU get drinks on US & we selected your name interested?" Doc. 146-31 (Smith Txt Live Message Records). Smith responded "Yes definitely!" *Id.* No Other Pub sent similar offers for parties with drink specials in July 2017, October 2017, and January 2018. *Id.* Smith again visited No Other Pub and made purchases in July 2017 and September 2017. Doc. 146-23 (Smith No Other Pub Transaction

Record); Doc. 146-25 (Smith No Other Pub Transaction Record). Smith has been registered on the national do-not-call registry since November 2, 2007. Doc. 175-33 (Smith NDNCR Confirmation).

Plaintiff Kagarice, however, has never been to No Other Pub. Doc. 179-24 (Kagarice Interrogatory Response). He received his first text message from No Other Pub in April 2017. Doc. 146-33 (Kagarice Txt Live Message Records). This first message stated "Hi Brian. This is Tara at No Other Pub. You've been selected for a late night VIP party with drinks on us and exclusive deals for your friends. You in?" *Id*. Kagarice responded asking how No Other Pub obtained his number, because he had never been to No Other Pub or entered a contest. *Id*. No Other Pub responded, "Then someone must have put your number down. I have no way of receiving your number any other way." *Id*. Kagarice then stated that he was not interested, and No Other Pub responded, "Thanks. I will remove you from the list." *Id*. No Other Pub's records reflect that Kagarice was then added to its opt-out list. Doc. 146-34 (No Other Pub Opt-out List); Doc. 146-35 (Txt Live Opt-out Record).

Kagarice did not receive any additional text messages, however he claims that No Other Pub called him at least once before and at least once after this text message exchange encouraging him to visit No Other Pub for a happy hour, and he remembers that one of these calls was made by a woman . Doc. 179-23 (Kagarice Deposition), pp. 52–54; Doc. 179-24. He does not recall the precise dates that he received these calls, although he testified that he believes that each occurred within one year prior to and within the year following the text message exchange. Doc. 179-23, pp. 125–26. Defendants contend that it is not typically their practice to make phone calls regarding their happy hour program, although they do admit that No Other Pub staff would at times use their personal phones to communicate with customers. Doc. 179-26 (No

4

Other Pub Interrogatory Responses). However, when they requested that Kagarice search his phone records for a set of six phone numbers that No Other Pub potentially could have called Kagarice with, there was no record of calls from these identified numbers. Doc. 146-11 (Stipulation). Kagarice has been registered on the national do-not-call registry since July 12, 2005. Doc. 149-38 (Kagarice NDNCR Confirmation).

Kagarice received these messages on his cell phone, which he claims is his only phone and is used primarily for personal purposes. Doc. 179-23. However, up to forty percent of his cell phone usage was related to his employment. *Id*. Kagarice is on a family plan with his parents and wife, and the bill is paid each month by his mother, whom he reimburses. *Id*. His portion of the monthly phone bill is ninety dollars, and his employer reimburses him seventy-five dollars each month, regardless of what percentage of his phone usage was dedicated to business. *Id*.

During the relevant time period, No Other Pub used Txt Live to send its promotional messages, a messaging platform developed by ECI. Doc. 146-18 (Keith Hudolin Declaration). In order to send messages using Txt Live, a venue employee imported contacts into the system database, either by individually typing in the contact's information or by uploading a spreadsheet of contacts in a comma-separated values (CSV) file. Doc. 146-12 (Benjamin Rodriguez Deposition); Doc. 146-13 (Blake Miller Deposition). This step was essential, as the platforms could not generate phone numbers independently. Doc. 179 (Plaintiffs' Response to Defendants' Statement of Facts), p. 43. To send text messages, a venue employee logged into the system, identified the number of individuals to be texted, narrowed the potential group of recipients by selecting the characteristics of those individuals if desired (e.g. recently added contact, birth date, etc.), typed out a message or selected a pre-saved message in the system, and pressed send. Doc.

146-20.  When a venue employee narrowed down the potential contacts to be messaged, either by determining a certain number of contacts and/or by filtering the contact characteristic, the system would then use a "shuffle" function to randomly select which contacts would be messaged.  Doc. 146-12; Doc. 146-13.  If a recipient responded by asking a question or by accepting the venue's offer for a giveaway or event, a venue employee could then message back and forth with the recipient in Txt Live regarding details.  Doc. 146-20.

The precise nature of the relationship between No Other Pub, ECI, and Cordish Companies as well as ECI's and Cordish Companies' involvement with the messaging campaigns are disputed.  ECI is a consultant firm based in Maryland that provides marketing and customer service-related support for restaurants, bars, and nightclubs including Kansas City Power & Light venues.  Doc. 146-18.  ECI contracted with a software development company to build Txt Live for ECI and the venues ECI worked with, including the Kansas City Power & Light venues.  *Id.*; 179-9 (Txt Live Domain Invoice).  As part of its marketing consulting, ECI allowed Kansas City Power & Light venues access to Txt Live in order to send text messages promoting their venues.  *Id.*  Although Defendants claim that venues reimbursed ECI for their use of Txt Live, *Id.*, they did not produce records of reimbursement payments from No Other Pub to ECI or Cordish Companies.  Doc. 175-12 (Defendant Request for Production Response).

ECI developed detailed district-wide policies for how venues including No Other Pub should collect data and use the Txt Live platform.  *See* Doc. 179-8 (ECI Email with KC Venue Marketing Agenda); Doc. 179-11 (Email on SMS Platform Training); Doc. 179-12 (ECI Txt Live Training Guide Email); Doc. 179-13 (ECI Email on message phrasing); Doc. 179-14 (ECI Email on Marketing Meetings and Data Collection District Policy); Doc. 179-15 (ECI Email on message phrasing to avoid spam filters); Doc. 179-16 (ECI Email on trying to standardize

6

campaigns across districts); Doc. 152-24 (ECI Sales Building Powerpoint communicating Data Collection Policies). ECI policies included guidelines on data collection as well as instructions on when to send messages, how to follow up with recipients, and how venues should word their messages to both maximize response rates and avoid being flagged as spam. *Id*. Data that was collected on sign-in sheets was forwarded to ECI for electronic storage. Doc. 179-5 (Kyla Bradley Deposition), pp. 87–90. The policies were implemented and enforced through regular communication and meetings between Kansas City based ECI staff and Kansas City Power & Light venues. Doc. 179-8; Doc. 179-17 (ECI Sales Meetings Email). If venues did not attend the district-wide meetings covering data collection policies and procedures, they would be unable to access the messaging platforms or have the ability to collect data. *Id*. Doc. 179-5, pp. 96–100.

Cordish Companies is a corporation incorporated in Maryland. Doc. 146-19 (Robert Fowler Declaration). On The Cordish Companies' website www.Cordish.com, it promotes itself as a real estate developer that owns and manages the businesses it creates, including the Kansas City Power & Light District, and it claims that its Kansas City office manages the entertainment block of Kansas City Power & Light, KC Live!. Doc. 179, pp. 9–10. Cordish also lists a number of individuals on its website who are part of "Our Team." Doc. 179, p. 10. Defendants claim, however, that the website statements are inaccurate, and they point to a disclaimer located on the "Terms and Conditions" page of its website, which states that "Cordish Companies, The Cordish Companies, The Cordish Company, Cordish, Entertainment Consulting International and ECI are trade names for a group of corporations, limited liability companies and partnerships" that do not actually own any of the properties described on the website. Doc. 194-2. Defendants contend that the Cordish Companies "is a passive company that conducts no

7

business or operations, has no employees and does not own any property, including in the state of Missouri." Doc. 146-19. Further, "[t]he name 'Cordish' functions primarily as a trade name often used to describe real estate developments around the country, which are each owned by a separate and distinct legal entity." *Id*.

Plaintiffs dispute this and, in addition to the statements regarding ownership and management on the corporation's website, offer evidence indicating that Cordish Companies is more than just a passive entity and that it oversees the Kansas City Power & Light District's operation and marketing scheme. For example, Lauren Bust was the Director of Digital Strategy at the Cordish Companies and testified that she went to the Cordish Companies to work everyday, that her and others' email addresses ended in @cordish.com, that she was supervised by John Cordish, that her work included working with other Cordish Companies employees to develop campaigns for some of the commercial properties owned by Cordish Companies and performing Txt Live messaging analysis, and that she understood Cordish Companies to be a real estate marketing firm. Doc. 179-3 (Lauren Bust Deposition), pp. 13–14, 28–32, 58; Doc. 179-29 (Lauren Bust Email regarding Txt Live data analysis); Doc. 179-6 (Text message log including messages from Lauren Bust and ECI staff). Another individual, Ashley St. Pierre, stated that she previously worked for the Cordish Companies and used an @cordish.com email address prior to becoming employed with ECI and working with Kansas City Power & Light venues. Doc. 179-4 (Ashley St. Pierre Deposition). Further, when it came time to transition from a former messaging platform SendSmart to a new text messaging platform vendor, these decisions were sent for approval to Reed Cordish, Cordish Companies Principal and ECI President. Doc. 179-7 (Email regarding new texting platforms). Reed Cordish also weighed in on the effectiveness of the district-wide marketing and data collection guides. Doc. 179-8. Finally, the Marketing

8

Manager for KC Live! Kyla Bradley testified that she emailed daily with Rachel Waller, the former Marketing Manager for Cordish and current Director of Marketing for Cordish, and that through Bradley, Rachel Waller would request certain sales promotions for the venues to implement. Doc. 179-5, pp. 16–17; Doc. 179, p. 9; Doc. 84-1, Ex. H, pp. 55–56; Doc. 152-20 (Email between ECI and Cordish regarding Data Collection Training).

## II.  MOTION FOR SUMMARY JUDGMENT

"Summary judgment is proper if, after viewing the evidence and drawing all reasonable inferences in the light most favorable to the nonmovant, no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law." *Higgins v. Union Pac. R.R. Co.*, 931 F.3d 664, 669 (8th Cir. 2019) (quotation marks and citation omitted); Fed. R. Civ. P. 56(a). While the moving party bears the burden of establishing a lack of any genuine issues of material fact, *Brunsting v. Lutsen Mountains Corp.*, 601 F.3d 813, 820 (8th Cir. 2010), the party opposing summary judgment "must set forth specific facts showing that there is a genuine issue of material fact for trial." *Thomas v. Corwin*, 483 F.3d 516, 527 (8th Cir. 2007). The Court must enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

### a.  COUNT I: ATDS Claim

Count I of Plaintiffs' Second Amended Complaint alleges that Defendants used an automatic telephone dialing system to send text messages without human intervention to Plaintiffs' cellular telephones. The parties have filed cross-motions for summary judgment on Count I.

The TCPA prohibits using an automated telephone dialing system (ATDS) to make non-emergency calls without the prior express consent of the recipient. 47 U.S.C. § 227(b)(1). A text message qualifies as a "call" within the scope of the Act. *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 667 (2016), as revised (Feb. 9, 2016). The TCPA defines an ATDS as "equipment which has the capacity—(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1). In their cross-motions, the parties dispute (1) the meaning of this definition and whether the messaging platform at issue here—Txt Live—falls within the definition's scope; (2) whether the messaging platform dials numbers without human intervention; and (3) whether the Defendants received the requisite prior express written consent to send autodialed telemarketing messages pursuant to 47 C.F.R. § 64.1200(a)(2).

The Court will first address the ATDS definition issue. The TCPA empowers the Federal Communications Commission to prescribe regulations to implement the ATDS prohibition. From the TCPA's 1991 enactment through 2003, the FCC's regulations "adopted, without elaboration, the statutory definition of [an] ATDS." *Pinkus v. Sirius XM Radio, Inc.*, 319 F.Supp.3d 927, 929 (N.D. Ill. 2018). In response to changes in technology, the FCC issued Orders in 2003, 2008, and 2015 further elaborating on its interpretation of the ATDS definition. *See In Re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 F.C.C. Rcd. 14014 (2003); *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 23 F.C.C. Rcd. 559 (2008); *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 30 F.C.C. Rcd. 7961 (2015). The FCC's 2015 Order was in part intended to clarify its prior interpretations of an ATDS. However, rather than providing clarity, the 2015 Order generated confusion within the telecommunications industry, and a

number of regulated entities challenged the FCC's treatment of the ATDS definition. The various challenges were consolidated in the D.C. Circuit Court of Appeals, and in 2018, the D.C. Circuit set aside the FCC's treatment of the ATDS definition.[3] *ACA Int'l v. Fed. Commc'ns Comm'n*, 885 F.3d 687, 694 (D.C. Cir. 2018). The D.C. Circuit determined that the FCC's interpretation of the word "capacity" in the ATDS definition was unreasonably and impermissibly expansive, as it would include all smartphones. *Id*. at 700. Further, the D.C. Circuit found that the FCC's contradictory discussion of the functions a device must perform to qualify as an autodialer, including whether random or sequential number generation was required, failed to satisfy the requirement of reasoned decisionmaking. *Id*. at 703. Therefore, the FCC's treatment of those matters was set aside and "only the statutory definition of ATDS as set

---

[3] There is some disagreement among courts as to whether the D.C. Circuit Court of Appeals' *ACA International* decision set aside the FCC's interpretation of an ATDS reflected throughout the 2003, 2008, and 2015 Orders or whether the invalidation was confined to the 2015 Order. The FCC defended its 2015 Order by claiming that the D.C. Circuit lacked jurisdiction to review the 2015 Order, because it "essentially ratifies the previous ones" from 2003 and 2008, and there was no timely appeal from those prior Orders. *ACA Int'l v. Fed. Commc'ns Comm'n*, 885 F.3d 687, 701 (D.C. Cir. 2018). The D.C. Circuit rejected this argument, finding that "[w]hile the Commission's latest ruling purports to reaffirm the prior orders, that does not shield the agency's pertinent pronouncements from review. The agency's prior rulings left significant uncertainty about the precise functions an autodialer must have the capacity to perform." *Id*. The parties here have not argued that the FCC's treatment of the ATDS definition in the 2003 or 2008 Orders remains intact, and the Court agrees with the majority of courts that have concluded that *ACA International* set aside the FCC's full treatment of the ATDS definition as reflected in the 2003, 2008, and 2015 Orders. *See, e.g.*, *Glasser v. Hilton Grand Vacations Co., LLC*, No. 18-14499, 2020 WL 415811 (11th Cir. Jan. 27, 2020); *Marks v. Crunch San Diego, LLC*, 904 F.3d 1041 (9th Cir. 2018); *Thompson-Harbach v. USAA Fed. Sav. Bank*, 359 F. Supp. 3d 606 (N.D. Iowa 2019); *Espejo v. Santander Consumer USA, Inc.*, No. 11 C 8987, 2019 WL 2450492 (N.D. Ill. June 12, 2019); *Pinkus v. Sirius XM Radio, Inc.*, 319 F.Supp.3d 927 (N.D. Ill. 2018)*; Sessions v. Barclays Bank Del*., 317 F.Supp.3d 1208 (N.D. Ga. 2018); *Roark v. Credit One Bank, N.A*., Civ. No. 16-173 (PAM/ECW), 2018 WL 5921652 (D. Minn. Nov. 13, 2018); *Marshall v. CBE Grp., Inc*., No. 216CV02406GMNNJK, 2018 WL 1567852 (D. Nev. Mar. 30, 2018).

forth by Congress in 1991 remains." *Marks v. Crunch San Diego, LLC*, 904 F.3d 1041, 1049 (9th Cir. 2018).

In the wake of *ACA International*, courts across the country are grappling with the statutory definition of ATDS. Relevant here, the key question is whether a dialing system must have the capacity to randomly or sequentially generate telephone numbers in order to qualify as an ATDS. As stated by the Seventh Circuit, "the awkward statutory wording, combined with changes in technology, makes this a very difficult question." *Gadelhak, v. AT&T Services, Inc.*, No. 19-1738, 2020 WL 808270, at *1 (7th Cir. Feb. 19, 2020). It is undisputed that Txt Live does not have the capacity to randomly or sequentially generate telephone numbers, and therefore the interpretive question is central to Defendants' liability.

The Court must "begin by analyzing the statutory language, assuming that the ordinary meaning of that language accurately expresses the legislative purpose." *United States v. I.L.*, 614 F.3d 817, 820 (8th Cir. 2010) (quoting *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 245, 130 S. Ct. 2149, 2152, 176 L. Ed. 2d 998 (2010)) (internal alterations omitted). "The Supreme Court has 'stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there . . . When the words of a statute are unambiguous, then, this first canon is also the last: judicial inquiry is complete." *Id.* (quoting *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992)).

The Court finds that the best reading of the plain text of the ATDS definition indicates that a system must include a random or sequential number generator. Recall that an ATDS is "equipment which has the capacity—(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1). The question is what role the term "using a random or sequential number generator"

12

plays in the definition. Grammatically, "[w]hen two conjoined verbs ('to store or produce') share a direct object ('telephone numbers to be called'), a modifier following that object ('using a random or sequential number generator') customarily modifies both verbs." *Glasser v. Hilton Grand Vacations Co., LLC*, No. 18-14499, 2020 WL 415811, at *2 (11th Cir. Jan. 27, 2020). Further, "the sentence contains a comma separating the phrase 'to store or produce telephone numbers to be called' from the phrase 'using a random or sequential number generator.' That, too, indicates that the clause modifies both 'store' and 'produce' and does not modify just the second verb." *Id. See also Thompson-Harbach v. USAA Fed. Sav. Bank*, 359 F. Supp. 3d 606, 625 (N.D. Iowa 2019) ("The comma separating 'using a random or sequential number generator' from the rest of subsection (a)(1)(A) makes it grammatically unlikely that the phrase modifies only 'produce' and not 'store.'")

Plaintiffs do not object to this interpretation as a grammatical matter but rather claim that it leads to an incongruous result. Plaintiffs argue that "it makes little sense to read 'using a random or sequential number generator' to modify 'store' because a number generator is not a storage device." Doc. 179, p. 4. Rather, "the definition of ATDS could more appropriately be read as 'equipment which has the capacity (A) to [i] store [telephone numbers to be called] or [ii] produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." *Id.* This interpretation was first advanced by the Ninth Circuit and was recently advocated by the Second Circuit. *See Marks*, 904 F.3d at 1052 ("[W]e read § 227(a)(1) to provide that the term automatic telephone dialing system means equipment which has the capacity—(1) to store numbers to be called or (2) to produce numbers to be called, using a random or sequential number generator—and to dial such numbers."); *Duran v. La Boom Disco, Inc.*, No. 19-600-CV, 2020 WL 1682773, at *3 (2d Cir. Apr. 7, 2020) (same).

However, as reviewed by the Eleventh Circuit,

> [t]he regulatory record confirms that, at the time of [the TCPA's] enactment, devices existed that could randomly or sequentially create telephone numbers and (1) make them available for immediate dialing or (2) make them available for later dialing. Sometimes storage would happen; sometimes it wouldn't. Under this reading, § 227(a) occupied the waterfront, covering devices that randomly or sequentially generated telephone numbers and dialed those numbers or stored them for later dialing."

*Glasser*, 948 F.3d at *3. *See also Gadelhak*, 2020 WL 808270 at *4 ("The record before the FCC reveals that at the time of the statute's enactment, devices existed with the capacity to generate random numbers and then store them in a file for a significant time before selecting them for dialing.")

Plaintiffs argue that this interpretation renders the word "store" superfluous, because "equipment that produces numbers using a random number generator and dials them automatically—whether immediately or after a time—is already captured by the definition." Doc. 195 (Plaintiffs' Reply in Support of the Motion for Partial Summary Judgment), p. 4. However, other Courts have not found this possible redundancy to be fatal to this interpretation. *See, e.g.*, *Gadelhak*, 2020 WL 808270 at *5 ("That surplusage is not a deal breaker. Given the range of storage capacities among telemarketing devices at the time of enactment, it is plausible that Congress chose some redundancy in order to cover the waterfront." (internal citation and quotation omitted)); *Glasser*, 948 F.3d at *3 (finding that while this reading creates a superfluity problem, it is possible that "in the context of this kind of technology, 'produce' and 'store' operate more as doublets than independent elements" and it would choose "the least superfluous approach—one that acknowledges some redundancy between store and produce but does not read a key clause ('using a random or sequential number generator') out of the statute."); *DeNova v. Ocwen Loan Servicing*, No. 8:17-CV-2204-T-23AAS, 2019 WL 4635552, at *3

14

(M.D. Fla. Sept. 24, 2019) ("[T]he occasional redundancy with 'store' and 'produce' cannot overcome the natural and grammatical reading of the statute.") Furthermore, construing subsection (A) to encompass either dialing numbers from a stored list or dialing numbers that have been randomly or sequentially generated risks rendering the entire subsection (A) to be superfluous. It is unclear what other numbers a system could automatically dial beyond those that have either been programmed to it or those that have been internally generated randomly or sequentially. If this had been Congress' intent, it could have merely prohibited equipment that dials numbers automatically, which would have the same effect.

The FCC's contemporaneous interpretation of the TCPA further supports this interpretation. In a 1992 Order, the FCC explained that the ATDS prohibition would not apply to functions like "'speed dialing,' 'call forwarding,' or public telephone delayed message services" because "the numbers called are not generated in a random or sequential fashion*." In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 7 F.C.C. Rcd. 8752, 8776 (1992). *See also Thompson-Harbach*, 359 F.Supp.3d at 625 (finding this interpretation "is also consistent with the FCC's 1995 ruling, in which the FCC described 'calls dialed to numbers generated randomly or in sequence' as 'autodialed.'" (quoting *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 10 FCC Rcd. 12391, 12400, 1995 WL 464817 (1995)).

Plaintiffs also argue the context and structure of the TCPA are incompatible with a definition that requires random or sequential number generation. For example, 47 U.S.C. § 227(b)(1) prohibits the use of an ATDS unless, among other exceptions, the call is made with the prior express consent of the called party or made solely to collect a debt owed to or guaranteed

15

by the United States.[4]  According to Plaintiffs, these provisions convey Congress' intent to include systems that dial from stored lists within the ATDS definition's scope, because a caller using an autodialer to call recipients with their prior express consent or to collect a government debt would likely be calling from a stored list rather than calling numbers generated randomly or sequentially.   However, the prohibition of § 227(b)(1) applies not only to the use of an ATDS but also to the calls made using an artificial or prerecorded voice.   Therefore, the consent and government debt exceptions would not be rendered useless as they still operate to provide an exception for telemarketers making calls using an artificial or prerecorded voice.  *See Thompson-Harbach*, 359 F. Supp. 3d at 626 (finding that because the exception also applies to the prohibition on the use of an artificial or prerecorded voice, "the existence of [the government debt] statutory exception does not render the Court's conclusion nonsensical.")  *See also Pinkus*, 319 F. Supp. 3d at 939 (finding that these exceptions do "not change the fact that the best reading of 47 U.S.C. § 227(a)(1) requires that an ATDS have the capacity to generate numbers randomly or sequentially and then to dial them, even if that capacity is not deployed for practical reasons.")

Moreover, the practical implications of the interpretation advanced by Plaintiffs bolster the Court's decision here.  In *ACA International*, the D.C. Circuit reviewed the FCC's interpretation of "capacity" as used in the ATDS definition, and found that the expansive interpretation, which would include within its scope any smartphone, was too broad:

> It is untenable to construe the term "capacity" in the statutory definition of an ATDS in a manner that brings within the definition's fold the most ubiquitous type of phone equipment known, used countless times each day for routine communications by the vast majority of people in the country. It cannot be the

---

[4] The government debt exemption was added by Congress though the Bipartisan Budget Act of 2015.  Pub. L. No. 114-74, §301(a) (2015).  Earlier in this litigation, the Court found the government debt exception to be an unconstitutional restriction on free speech that was severable from the TCPA.  *See Smith v. Truman Rd. Dev., LLC*, 414 F. Supp. 3d 1205 (W.D. Mo. 2019).

16

case that every uninvited communication from a smartphone infringes federal law, and that nearly every American is a TCPA-violator-in-waiting, if not a violator-in-fact.

*ACA Int'l*, 885 F.3d at 698.  If, as Plaintiffs contend, all that is required to be an ATDS is for a device to store numbers and to dial them automatically, the ATDS definition would seemingly encompass most smartphones in operation today.  *See Glasser*, 948 F.3d at 1309 ("Suddenly an unsolicited call using voice activated software (think Siri, Cortana, Alexa) or an automatic 'I'm driving' text message could be a violation worth $500."); *Gadelhak*, 2020 WL 808270 (finding the more expansive interpretation "would create liability for every text message sent from an iPhone. That is a sweeping restriction on private consumer conduct that is inconsistent with the statute's narrower focus . . . An iPhone of course can store telephone numbers; it can also send text messages automatically, for example by using the 'Do Not Disturb While Driving' function.")  Plaintiffs' proffered interpretation would draw into the scope of the TCPA's prohibition conduct that falls outside of the narrow focus that Congress intended the statute to address.

Therefore, in order to qualify as an ATDS, a device must have the capacity to generate numbers randomly or sequentially.  A majority of courts outside the Ninth Circuit, including the Third, Seventh, and Eleventh Circuit Courts of Appeals, as well as the three district courts within the Eighth Circuit to have considered the issue, have similarly found that the best reading of the statute requires random or sequential number generation.  *See Gadelhak,* 2020 WL 808270; *Glasser*, 2020 WL 415811; *Dominguez v. Yahoo, Inc.,* 894 F.3d 116 (3d Cir. 2018); *Eisenband v. Pine Belt Auto., Inc.*, No. CV178549FLWLHG, 2020 WL 1486045 (D.N.J. Mar. 27, 2020); *DeCapua v. Metro. Prop. & Cas. Ins. Co.*, No. CV 18-590 WES, 2020 WL 1303248 (D.R.I. Mar. 19, 2020);  *Beal v. Outfield Brew House, LLC*, No. 2:18-CV-4028-MDH, 2020 WL 618839

17

(W.D. Mo. Feb. 10, 2020); *Thompson-Harbach*, 359 F.Supp.3d 606; *Hudson v. Ralph Lauren Corp.*, 385 F. Supp. 3d 639 (N.D. Ill. 2019); *DeNova*, 2019 WL 4635552; *Smith v. Premier Dermatology*, No. 17 C 3712, 2019 WL 4261245, at *1 (N.D. Ill. Sept. 9, 2019); *Adams v. Safe Home Security, Inc.*, No. 3:18-vs-03098-M, 2019 WL 3428776 (N.D. Tex. Jul. 30, 2019); *Snow v. Gen. Elec. Co.*, No. 5:18-CV-511-FL, 2019 WL 2500407 (E.D.N.C. June 14, 2019), appeal dismissed, No. 19-1724, 2019 WL 7500455 (4th Cir. Dec. 30, 2019); *Gadelhak v. AT&T Servs., Inc.*, No. 17-CV-01559, 2019 WL 1429346, (N.D. Ill. Mar. 29, 2019); *Folkerts v. Seterus, Inc.*, No. 17 C 4171, 2019 WL 1227790 (N.D. Ill. Mar. 15, 2019); *Might v. Capital One Bank (USA), N.A.*, No. CIV-18-716-R, 2019 WL 544955 (W.D. Okla. Feb. 11, 2019); *Johnson v. Yahoo!, Inc.*, 346 F.Supp.3d 1159 (N.D. Ill. 2018); *Pinkus*, 319 F. Supp. 3d 927; *Roark v. Credit One Bank, N.A.*, 2018 WL 5921652 (D. Minn. Nov. 13, 2018); *Fleming v. Associated Credit Servs., Inc.*, 342 F. Supp. 3d 563 (D.N.J. 2018); *Keyes v. Ocwen Loan Servicing, LLC*, 335 F. Supp. 3d 951 (E.D. Mich. 2018).

It is undisputed that Txt Live did not randomly or sequentially generate numbers to be called but rather messaged numbers stored in a customer database. As an alternative argument, Plaintiffs claim that even if this Court finds that an ATDS must use a random or sequential number generator, Txt Live still qualifies because it uses a "shuffle function" to randomly select which numbers from the list of contacts to message. Plaintiffs point to no authority to support their claim that when Congress described a "random or sequential number generator," it was referring to the order in which a list of numbers are called. The legislative history indicates otherwise. *See, e.g.*, S. Rep. No. 102-178, at 2 (1991) (reviewing consumer complaints and noting that "some automatic dialers will dial numbers in sequence, thereby tying up all the lines of a business and preventing any outgoing calls"). Other courts have rejected this same

argument.  *See Beal v. Outfield Brew House, LLC*, No. 2:18-CV-4028-MDH, 2020 WL 618839, at *5 (W.D. Mo. Feb. 10, 2020) (considering the same argument with respect to Txt Live and finding "if the software can randomly select phone numbers, that is not the same as generating them. Instead, Plaintiffs' argument is that the software can shuffle, or randomize, from the contacts that were already uploaded into the system manually. This does not constitute an ATDS."); *Pinkus*, 318 F.Supp.3d at 938 (finding that "using a random or sequential number generator" could not refer to how numbers are called because "numbers must necessarily be called in some order—either in random or some other sequence" and "if using a random or sequential number generator referred to the order in which numbers are dialed and not the process of generating them, the phrase would have followed, rather than preceded, 'dial such numbers' in section (a)(1)(B)'"). Txt Live's "shuffle" function does not constitute a random or sequential number generator under the TCPA.

Although the statutory interpretation is perhaps imperfect, it is the Court's "best reading of a thorny statutory provision." *Gadelhak*, 2020 WL 808270, at *8.  Because it is undisputed that Txt Live does not have the capacity to randomly or sequentially generate numbers, the Court need not consider the parties' additional arguments regarding human intervention or prior express consent.  Defendants' motion for summary judgment as to Count I is granted.  Plaintiffs' motion for partial summary judgment as to Count I is denied.

### b.  COUNT III: Do-Not-Call Claim

Count III of Plaintiffs' Second Amended Complaint alleges Defendants violated 47 C.F.R. § 64.1200(c), which prohibits telephone solicitations to residential telephone subscribers who are registered on the national do-not-call registry.  A telephone solicitation is defined as:

19

the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person, but such term does not include a call or message:

(i)     To any person with that person's prior express invitation or permission; [or]
(ii)    To any person with whom the caller has an established business relationship . . .

The TCPA provides a private right of action for individuals who have received more than one telephone call within any twelve-month period in violation of these regulations. *See* 47 U.S.C. § 227(c)(5). A plaintiff can recover up to $500 in statutory damages for each violation. *Id*. The Court will address Defendants' arguments as to each Plaintiff separately.

### i. Plaintiff Smith

As to Plaintiff Smith, Defendants first argue that No Other Pub had an established business relationship (EBR) with Smith, and therefore the messages it sent were not telephone solicitations under the TCPA. An established business relationship (EBR) is, in relevant part:

a prior or existing relationship formed by a voluntary two-way communication between a person or entity and a residential subscriber with or without an exchange of consideration, on the basis of the subscriber's purchase or transaction with the entity within the eighteen (18) months immediately preceding the date of the telephone call

47 C.F.R. § 64.1200(f)(5). "[A] potential recipient's existing business relationship with the defendant is an affirmative defense to the TCPA." *Elkins v. Medco Health Sols., Inc.*, No. 4:12CV2141 TIA, 2014 WL 1663406, at *8 (E.D. Mo. Apr. 25, 2014); *see also St. Louis Heart Ctr., Inc. v. Forest Pharm., Inc.*, No. 4:12-CV-02224, 2013 WL 1076540, at *2 n. 2 (E.D. Mo. Mar. 13, 2013) (same).

In January 2017, Smith visited No Other Pub to attend a happy hour hosted by a friend, where he provided his contact information on a sign-in sheet in order to check-in to the happy hour, receive discounts on drinks, and enter a raffle for a free happy hour. He acknowledged that

20

he expected to receive a communication from No Other Pub regarding this raffle. Smith subsequently purchased drinks at the discounted happy hour price. Shortly thereafter, on February 1, 2017, No Other Pub messaged Smith informing him he had won a happy hour party and asking if he was interested, to which he responded "Yes definitely!" No Other Pub sent three messages over the course of the next year again offering to host a similar party.

First, the parties dispute what is needed to establish an EBR. Smith claims that in addition to evidence of Smith's purchases, Defendants must also point to evidence of a "two-way communication" to demonstrate an EBR was formed. Defendants argue that evidence of a recipient's purchase is sufficient.

Reviewing the legislative and FCC materials describing the EBR exception as well as courts that have applied the exception, the Court finds more support for Defendants' position here. Although the TCPA does not define an EBR, when first enacted in 1991 the statute included the EBR exception in the "telephone solicitation" definition. The legislative history indicates that Congress intended the relationship to be interpreted broadly and contemplated that it could be formed through a single purchase. *See, e.g.*, H. Rep. No. 102–317, at 14–15 (1991) ("[A]n 'established business relationship' [] could be based upon any prior transaction, negotiation, or inquiry between the called party and the business entity"); ("A person who recently bought a piece of merchandise may receive a call from the retailer regarding special offers or information on related lines of merchandise"); (describing whether an EBR could extend to a business's affiliates, and finding that "a relationship established through the purchase of a piece of merchandise from a company's retail or catalogue division does not necessarily mean that a business relationship has been established between the customer and the company's other unaffiliated divisions or subsidiaries.") The FCC has likewise interpreted the term

broadly. *See, e.g.*, *In Re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 F.C.C. Rcd. 14014, 14082–83, n. 382 (2003) ("[T]he EBR should not be limited by product or service. In today's market, many companies offer a wide variety of services and products. Restricting the EBR by product or service could interfere with companies' abilities to market them efficiently"); ("[I]f a consumer purchases a seller's products at a retail store or from an independent dealer, such purchase would establish a business relationship with the seller, entitling the seller to call that consumer under the EBR exemption.")

Courts applying the EBR exception have also found it applies solely on the basis of a purchase or transaction and do not discuss the need for a separate two-way communication. *See, e.g.*, *Krakauer v. Dish Network L.L.C.*, 311 F.R.D. 384, 387–88 (M.D.N.C. 2015) (An EBR "is created after an individual makes a purchase, inquiry, or application for products or services and lasts for a certain number of months."); *Elkins*, No. 4:12CV2141 TIA, 2014 WL 1663406, at *8 (E.D. Mo. Apr. 25, 2014) (EBR existed where plaintiff used defendant's prescription benefit management services to fill prescriptions at defendant's pharmacies); *Zelma v. Art Conway*, No. 2:12-CV-00256 DMC, 2013 WL 6498548, at *2 (D.N.J. Dec. 11, 2013) ("Plaintiff's election to receive a free Prevention Magazine subscription through the SkyMiles program is a sufficient 'transaction' to trigger the [EBR] exception [with Prevention Magazine]"); *Cubbage v. Talbots, Inc.*, No. C09-911BHS, 2010 WL 2710628, at *3 (W.D. Wash. July 7, 2010) ("In this case, Mitchell purchased at least one product at a Talbots store within the eighteen months prior to April of 2009, the date of the call. Therefore, Mitchell and Talbots had an established business relationship."); *Hovila v. Tween Brands, Inc.*, No. C09-0491RSL, 2010 WL 1433417, at *5 (W.D. Wash. Apr. 7, 2010) (calls made after plaintiff purchased merchandise at defendant's

stores fell within EBR exception).  Smith has cited no authority to support his position that more is required.

Here, Smith visited No Other Pub, he provided his information in order to receive drink discounts and enter a raffle for a free happy hour, he admits he expected to receive communications regarding that raffle, he then purchased drinks at that discounted price, and he later received text messages informing him that he had won a raffle for a free happy hour.  Smith argues that this exchange cannot be considered "voluntary" as required by an EBR, but there is no evidence that Smith would have been unable to attend the happy hour or purchase drinks at No Other Pub had he not provided his information.  Smith cites no authority for his position that providing a phone number in order to get a discount on a product or service that is otherwise fully accessible makes an exchange involuntary.  Smith further argues that the messages he received months later exceeded the scope of any EBR, because he recalls a No Other Pub employee informing him that he might be contacted about winning a raffle that particular evening, not at a later date.  However, the Court finds no basis in the regulation's text or caselaw suggesting that if a salesperson mentions that they will contact you on a certain date, that the EBR is then limited to that particular date.  Smith does not claim that he instructed No Other Pub staff that he only wished to receive a message that evening.  Smith was apparently unphased by receiving a text beyond that particular night, demonstrated by his response of "Yes definitely!" when he was informed that he had won a raffle for a free happy hour weeks later.

The Court finds that Smith had an EBR with No Other Pub as of January 2017.  Each of the texts sent to him were within an eighteen-month period following the establishment of that relationship.  Therefore, the messages No Other Pub sent to Smith were not violations of 47 C.F.R. § 64.1200(c), because they were not telephone solicitations as they were made to a

recipient with whom No Other Pub had an EBR. The Court need not address Defendants' remaining arguments as to Smith on this Count. Defendants' motion for summary judgment as to Plaintiff Smith on Count III is granted.

### ii. Plaintiff Kagarice

As to Plaintiff Kagarice, Defendants argue that they are entitled to summary judgment on Count III because (1) 47 C.F.R. § 64.1200(c) does not apply to receipt of text messages on a cell phone but rather solely applies to calls made to a "residential telephone subscriber;" (2) Kagarice used his cell phone for business purposes and therefore is not a "residential telephone subscriber;" and (3) Kagarice did not receive more than one telephone solicitation.

Defendants first argue that 47 C.F.R. § 64.1200(c) does not apply to receipt of text messages on a cell phone because these regulations only apply to calls made to a "residential telephone subscriber," defined as a traditional landline in a residence. However, while 47 C.F.R. § 64.1200(c) states that it applies to calls to "a residential telephone subscriber," the regulations go on to unambiguously provide that "[t]he rules set forth in paragraph (c) and (d) of this section are applicable to any person or entity making telephone solicitations or telemarketing calls to wireless telephone numbers," as described in a 2003 FCC Order. 47 C.F.R. § 64.1200(e) (citing *In Re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 F.C.C. Rcd. 14014 (2003)). None of the authorities cited by Defendants address § 64.1200(e) or the 2003 FCC Order finding "it is more consistent with the overall intent of the TCPA to allow wireless subscribers to benefit from the full range of TCPA protections." *Id*. at 14083. Other courts that have considered the application of § 64.1200(e) have concluded that a cell phone user can qualify as a residential telephone subscriber under § 64.1200(c) and (d). *See, e.g.*, *Stevens-Bratton v. TruGreen, Inc.*, No. 2:15-2472, 2020 WL 556405, at *4 (W.D. Tenn. Feb. 4, 2020)

("A cellular telephone can satisfy the residential telephone subscriber element of § 64.1200(c) & (d)"); *Izor v. Abacus Data Sys., Inc.*, No. 19-CV-01057-HSG, 2019 WL 3555110, at *2 (N.D. Cal. Aug. 5, 2019) (same); *Hodgin v. Parker Waichman Llp*, No. 3:14-CV-733-DJH, 2015 WL 13022289, at *3 (W.D. Ky. Sept. 30, 2015) ("[T]he FCC has been clear in interpreting 'residential subscriber' to include cell phones."). This Court agrees. A cell phone user can qualify as a residential telephone subscriber under 47 C.F.R. § 64.1200(c) and (d).[5]

Defendants next argue that, with respect to Kagarice's cell phone use in particular, that he uses his phone for business purposes and therefore is not a residential telephone subscriber. Up to forty percent of Kagarice's cell phone usage was related to his employment. Kagarice is on a family plan with his parents and wife, and the bill is paid each month by his mother, whom he reimburses. His portion of the monthly phone bill is ninety dollars, and his employer reimburses him seventy-five dollars each month, regardless of what percentage of his phone usage was dedicated to business. Although Kagarice acknowledges that he does conduct some business using this cell phone line, he asserts that it was his only telephone line and is primarily reserved for his personal use and that therefore this is a question inappropriate for summary judgment.

The national do-not-call registry does not permit businesses to register their numbers with the registry, and the FCC has made clear that calls to businesses that have been impermissibly

---

[5] To the extent that Defendants argue that an extension of these protections to cellular phone users is contrary to the TCPA's statutory text, *see* Doc. 146, pp. 13–14, "[t]he Hobbs Act provides that the courts of appeals have exclusive jurisdiction to determine the validity of FCC orders." *Nack v. Walburg*, 715 F.3d 680, 685 (8th Cir. 2013) (quoting 28 U.S.C. § 2342 (2006)). Therefore, the Court "must interpret the regulation in a manner consistent with its plain language and the FCC's interpretation." *Id.* *But see PDR Network, LLC v. Carlton & Harris Chiropractic, Inc.*, 139 S. Ct. 2051, 2055, 204 L. Ed. 2d 433 (2019) (raising without deciding the question of "whether the Hobbs Act's commitment of 'exclusive jurisdiction' to the courts of appeals requires a district court in a private enforcement suit like this one to follow the FCC's 2006 Order interpreting the Telephone Act.")

registered with the national do-not-call registry is not a violation of the regulations.  *See, e.g.*, *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 FCC Rcd. 14014, 14039–40 ¶ 37 (2003) ("The national do-not-call rules will also not prohibit calls to businesses");  *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 20 FCC Rcd. 3788, 3793 ¶ 14 (2005) ("To the extent that some business numbers have been inadvertently registered on the national registry, calls made to such numbers will not be considered violations of our rules").  However, the FCC has "decline[d] to exempt from the do-not-call rules those calls made to 'home-based businesses'; rather, [the FCC] will review such calls as they are brought to our attention to determine whether or not the call was made to a residential subscriber."  *In the Matter of Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 20 FCC Rcd. 3788, 3793 (2005).

In light of this guidance, "courts have routinely looked at the facts and circumstances surrounding a particular case before deciding whether TCPA protection extended to a particular telephone number that was used for both business and residential purposes."  *Blevins v. Premium Merch. Funding One, LLC*, No. 2:18-CV-377, 2018 WL 5303973, at *2 (S.D. Ohio Oct. 25, 2018) (listing cases).  Where there is clear evidence that a cell phone line is used only or primarily as a business line, courts have granted summary judgment to defendants.  *See, e.g.*, *Mattson v. Quicken Loans Inc.*, No. 3:18-CV-00989-YY, 2019 WL 7630856, at *5 (D. Or. Nov. 7, 2019) (summary judgment granted for defendant on plaintiff's national do-not-call claim where it offered evidence that plaintiff's employer purchased the phone and that the phone bill was sent directly to the employer, indicating it was a business phone); *Bank v. Indep. Energy Grp. LLC*, No. 12-CV-1369 JG VMS, 2015 WL 4488070, at *2 (E.D.N.Y. July 23, 2015) (granting summary judgment for defendant where plaintiff provided his "number on his business

26

card, professional letterhead for his law practice, and in pleadings and court filings, and he provides it to clients, prospective clients, other attorneys, and business contacts," as well as "maintains his attorney registration through the New York Unified Court System utilizing the Subject Telephone number as his contact number.").

However, where there is "evidence supporting both the contention that Plaintiff's phone number was a residential phone number and that the phone number was a business phone number," some Courts have determined that the question of whether the phone number was a business number or a residential number is a disputed issue of material fact inappropriate for summary judgment. *Clauss v. Legend Sec., Inc.*, No. 4:13-CV-00381-JAJ, 2014 WL 10007080, at *3 (S.D. Iowa Sept. 8, 2014).

The Court here finds that there is a dispute of fact regarding whether Kagarice's use of his cell phone qualifies him as a "residential telephone subscriber" or whether it is a business line. Although he used the phone for business purposes and his employer reimbursed him for a portion of his bill, he has testified that a majority of the phone's use (at least sixty percent) was for personal use, that he did not have any other telephone line, that he was on a family cell phone plan with his parents and wife, and that his primary method of communicating with his business clients was in person. His employer did not purchase the phone, nor was the bill sent directly to his employer, as in *Mattson*. There is also no evidence that he "held out [his cell phone line] to the public as a business line" to the degree seen in *Bank*. Thus, the Court cannot say that no reasonable jury could find that Kagarice was a residential telephone subscriber. Therefore, viewing all facts and drawing all inference in Kagarice's favor, he has demonstrated that there remains a dispute of material fact, and Defendants' motion for summary judgment on this ground is denied.

27

Finally, Defendants argue that Kagarice cannot show that there was more than one telephone solicitation made to his phone, as required to sustain a cause of action under 47 U.S.C. § 227(c). Kagarice received his first text message from No Other Pub on April 12, 2017, offering him a free party. After the brief exchange that followed wherein Kagarice asked how No Other Pub had gotten his number and informed the sender that he wasn't interested, No Other Pub responded "Thanks. I will remove you from the list." Although Kagarice did not receive any additional text messages, he claims that No Other Pub called him at least once before and at least once after this text message exchange encouraging him to visit No Other Pub for a happy hour, and he recalls that one of these calls was made by a woman. He does not recall the precise dates that he received these calls, although he testified that he believes that each occurred within one year prior to and within the year following the text message exchange. Defendants contend that it is not typically their practice to make phone calls regarding their happy hour program, although they do admit that No Other Pub staff would at times use their personal phones to communicate with customers. However, when they requested that Kagarice search his phone records for a set of six phone numbers that No Other Pub potentially could have called Kagarice on, there was no record of calls from these identified numbers. Kagarice responds that the results of this search are not dispositive, because the set of No Other Pub staff phone numbers provided by Defendants was incomplete.

Although Kagarice's evidence on this point is perhaps thin, the Court finds his sworn testimony demonstrates a dispute of material fact sufficient to survive summary judgment. *See Harry Stephens Farms, Inc. v. Wormald Americas, Inc.*, 571 F.3d 820, 821 (8th Cir. 2009) ("[A]lthough two of defendants' witnesses stated in affidavits that [plaintiff] had made statements to them in 2002 indicating he was aware of contamination on his property, [plaintiff]

28

provided conflicting deposition testimony. Thus, we conclude that there remains a genuine issue of material fact, which cannot be resolved without making credibility determinations, weighing evidence, and drawing inferences against the non-moving party.") Therefore, a dispute of fact remains as to the alleged phone calls. If a jury believes Kagarice that either of these phone calls took place within one-year of the text message he received, then he may be entitled to a relief on this claim.

Therefore, Defendants motion for summary judgment as to Kagarice on Count III is denied.

### c. COUNT II: Procedural Claim

In Count II, Plaintiffs allege that Defendants sent more than one telemarketing message within a twelve-month period without first instituting procedures to maintain a list of individuals who request not to receive telemarketing calls made by that entity, in violation of 47 C.F.R. § 64.1200(d). Per the regulations, these internal do-not-call procedures must meet certain minimum standards, including maintaining a written policy for keeping an internal do-not-call list, training personnel engaged in telemarketing, and recording when an individual requests to be put on an entity's do-not-call list. *See* 47 C.F.R. § 64.1200(d)(1)–(6).

Defendants argue that they are entitled to summary judgment on Count II because (1) Plaintiffs lack a private right of action to redress violations of 47 C.F.R. § 64.1200(d); (2) 47 C.F.R. § 64.1200(d) does not apply to receipt of messages on a cell phone but rather solely applies to calls made to a "residential telephone subscriber;" and (3) the Plaintiffs have failed to establish more than one telemarketing message.

First, Defendants assert that the Plaintiffs lack a private right of action for their claims. "[T]he fact that a federal statute has been violated and some person harmed does not

automatically give rise to a private cause of action in favor of that person." *Touche Ross & Co. v. Redington*, 442 U.S. 560, 568, 99 S. Ct. 2479, 2485, 61 L. Ed. 2d 82 (1979). Rather, "[i]f the statute itself does not display an intent to create a private remedy, then a cause of action does not exist." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1856, 198 L. Ed. 2d 290 (2017) (internal quotations and alterations omitted).

The Plaintiffs' Count II states a claim for violations of the regulatory provisions of 47 C.F.R. § 64.1200(d). The TCPA provides that an individual "who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection" may pursue a private right of action. 47 U.S.C. § 227(c)(5). Thus the question is whether 47 C.F.R. § 64.1200(d) was promulgated pursuant to § 227(c) of the TCPA or some other subsection. Defendants argue that 47 C.F.R. § 64.1200(d) was promulgated pursuant to § 227(d) of the TCPA, which directs the FCC to promulgate regulations setting the technical and procedural standards for telephone facsimile machines and artificial or prerecorded voice systems and does not include a private right of action. *See* 47 U.S.C. § 227(d). Because the requirements in 47 C.F.R. § 64.1200(d) are somewhat procedural in nature, Defendants argue, these regulations must have been promulgated pursuant to § 227(d) of the TCPA.

The Court disagrees. First, the substance of 47 C.F.R. § 64.1200(d) more directly corresponds to the substance of § 227(c) of the TCPA rather than § 227(d). The TCPA's § 227(c) requires the FCC to initiate rulemaking proceedings to evaluate, among other issues, the potential use of "industry-based or company-specific 'do not call' systems." Section 227(d), however, directs the FCC to revise regulations setting technical and procedural standards for telephone facsimile machines and artificial or prerecorded voice systems and does not address

internal, company-specific do-not-call procedures. Even accepting Defendants' argument that the internal do-not-call standards described in § 64.1200(d) could fairly be characterized as "procedural," 47 U.S.C. § 227(d) restricts its applicability to technical and procedural standards of these particular devices whereas 47 C.F.R. § 64.1200(d) neither mentions nor restricts its applicability to these devices.

Further, the regulatory record indicates that when the internal do-not-call standards were first promulgated in 1992, they were promulgated pursuant to § 227(c). For example, § 227(c) is entitled "Protection of subscriber privacy rights," and the 1992 FCC Order establishing the internal do-not-call provisions states that "[t]he comments persuade us that we must mandate procedures for establishing company-specific do-not-call lists to ensure effective compliance with and enforcement of the requirements for protecting consumer privacy," which is then followed by a citation to the internal do-not-call standards. *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 7 F.C.C. Rcd. 8752, 8766 (1992). In 1992, these internal do-not-call procedures were enumerated in § 64.1200(e) of the regulations rather than their current location in § 64.1200(d). *Compare id.* at 8791 *with* 47 C.F.R. § 64.1200(d). The 1992 FCC Order discusses how, as required by § 227(c)(1)(A), the FCC weighed the costs and benefits of industry-based versus company-specific do-not-call systems and determined that the company-specific do-not-call procedures in § 64.1200(e) were the appropriate solution. *See* 7 F.C.C. Rcd. 8752 at ¶¶ 23–24. Further, at the time, § 64.1200(d) set requirements regarding "all artificial or prerecorded telephone messages delivered by an automatic telephone dialing system," and the 1992 FCC Order makes clear that these were promulgated pursuant to 47 U.S.C. § 227(d). *See id.* at ¶ 53 ("The TCPA mandates that all artificial or prerecorded telephone messages delivered by an autodialer state clearly the identity of the caller at the beginning of the

31

message and the caller's telephone number or address during or after the message, § 227(d)(3)(A), and we adopt this requirement in our rules, 64.1200(d).")

Therefore, Defendants' argument that Plaintiffs lack a private right of action for a violation of 47 C.F.R. § 64.1200(d) is rejected. Other courts have found the same. *See Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1265 (11th Cir. 2019) (reviewing the promulgation of §64.1200(d) and finding that pursuant to 47 U.S.C. § 227(c)(5) "[t]he TCPA creates a private right of action for anyone who receives more than one call within a year from the same entity in violation of these regulations."); *Charvat v. GVN Michigan, Inc.*, 561 F.3d 623, 631 (6th Cir. 2009) (finding a private right of action for violations of 47 C.F.R. § 64.1200(d) under 47 U.S.C. § 227(c)(5)); *Rosenberg v. LoanDepot.com LLC*, No. CV 19-10661-NMG, 2020 WL 409634, at *11 (D. Mass. Jan. 24, 2020) ("The available record indicates that § 64.1200(d) was promulgated under § 227(c) and contains a private right of action."); *Valdes v. Century 21 Real Estate, LLC*, No. CV 2:19-05411, 2019 WL 5388162, at *3 (D.N.J. Oct. 22, 2019) (citing 47 U.S.C. § 227(c)(5) as "establishing a private right of action for violations of 47 C.F.R. §§ 64.1200(c) and (d)."); *Drew v. Lexington Consumer Advocacy, LLC*, No. 16-CV-00200-LB, 2016 WL 1559717, at *6 (N.D. Cal. Apr. 18, 2016) ("47 C.F.R. § 64.1200(c) and (d) are regulations promulgated under § 227(c)").

Next, Defendants argue that as cell phone users, the Plaintiffs do not qualify as residential subscribers. Further, as to Kagarice in particular, that his use of his cell phone for business purposes disqualifies him from being a "residential telephone subscriber."

For the same reasons discussed above with respect to Count III, Defendants' arguments that cell phone users are unable to qualify as a residential telephone subscriber under 47 C.F.R. § 64.1200(d) is rejected. Further, for the same reasons discussed above, there remains a dispute of

fact as to whether Plaintiff Kagarice is a residential telephone subscriber given his partial business use of his cell phone.

As to Plaintiff Smith, it is only in their Reply brief that Defendants assert the argument as it pertains to Smith that "even if the protections of the DNC provisions of the TCPA apply to cell phones . . . Plaintiffs must still demonstrate that they apply to the text messages at issue here. Plaintiffs rely on motion to dismiss cases that do not address this evidentiary issue." Doc. 194, p. 13. Although the FCC has determined that the national do-not-call and internal do-not-call provisions do apply to cell phone users and presumes that those registered on the national do-not-call registry are residential subscribers, the agency notes in its 2003 Order that further proof may be required to show that a wireless subscriber uses their wireless phone in the same manner in which they would use their residential landline phone.[6] *In Re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 F.C.C. Rcd. 14014, 14039 (2003).

As an initial matter, Smith was unable to respond to this specific claim in his opposition to the motion as it was raised for the first time in a Reply brief. Although Defendants'

---

[6] The 2003 FCC Order does not further clarify what proof would demonstrate that a wireless subscriber is a residential subscriber for the purposes of the TCPA. Courts have rejected a plaintiff's claim that his or her cell phone use qualified him or her as a residential telephone subscriber where there was evidence that the individual maintained a traditional land line in addition to their wireless line, *see Stevens-Bratton v. TruGreen, Inc.*, No. 2:15-2472, 2020 WL 556405, at *3 (W.D. Tenn. Feb. 4, 2020), *Lee v. Loandepot.com, LLC*, No. 14-CV-01084-EFM, 2016 WL 4382786, at *6 (D. Kan. Aug. 17, 2016), or, as discussed above with respect to Plaintiff Kagarice, where there was evidence that the plaintiff used the number for business purposes, *see Mattson v. Quicken Loans Inc.*, No. 3:18-CV-00989-YY, 2019 WL 7630856, at *5 (D. Or. Nov. 7, 2019) (summary judgment granted for defendant on plaintiff's national do-not-call claim where it offered evidence that plaintiff's employer purchased the phone and that the phone bill was sent directly to the employer, indicating it was a business phone), *Shelton v. Target Advance LLC*, No. CV 18-2070, 2019 WL 1641353, at *6 (E.D. Pa. Apr. 16, 2019) ("[B]ecause Plaintiff held the Phone Number out to the world as a business phone number, he could not register it on the national do-not-call registry for purposes of avoiding business-to-business calls, such as those giving rise to this action."). Defendants have not pointed to any similar evidence here as to Plaintiff Smith.

33

Suggestions in Support of their Motion for Summary Judgment raised the specific circumstances of Plaintiff Kagarice's cell phone use, Defendants did not raise the same argument as to Smith but rather focused on their argument that the TCPA's statutory language and structure indicate that cell phone users categorically do not qualify as residential telephone subscribers. *See* Doc. 146, pp. 13–14. *See also Myers v. KNS Dev. Corp.*, No. 2:17-CV-04076-NKL, 2017 WL 4202242, at \*5 n. 4 (W.D. Mo. Sept. 21, 2017) ("Because this argument was raised for the first time on reply, the Court will not address it."). Further, in their Reply brief Defendants have neither cited to evidence in the record indicating Smith's particular cell phone use would prevent him from being a residential telephone subscriber nor claimed that there is an absence of evidence in the record to support this essential element. *See Celotex Corp.*, 477 U.S. at 323 ("Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." (quoting Fed. R. Civ. P. 56(c))). *See also Stevens-Bratton v. TruGreen, Inc.*, No. 2:15-2472, 2020 WL 556405, at \*3 (W.D. Tenn. Feb. 4, 2020) (granting summary judgment for defendant where they presented evidence that plaintiff was not a residential telephone subscriber "because she provided both a cellular telephone number and a home telephone number in her service agreement with [defendant]" and plaintiff failed to offer sufficient evidence in response). Further, on the record before the Court, there is sufficient evidence to overcome Defendants' argument on this issue. For instance, Smith testified in a deposition that he believes he first starting using this cell phone number when his parents bought a phone for him and his sister to share in high school. Moreover, there is no evidence that Smith's employer reimburses him for

his cell phone usage or that Smith uses his phone for business purposes. Nor have Defendants pointed to evidence that Smith has a separate landline telephone. Therefore, in light of Defendants' failure to properly raise and support this argument in their Motion, in conjunction with the Court's review of the record, Defendants' motion for summary judgment on this ground as to Plaintiff Smith is denied.

Finally, Defendants assert that "in order to maintain these claims, Plaintiffs would need to establish more than one 'telemarketing' call within a twelve month period, which they cannot do. (Section II.B.)." Doc. 146, p. 21. Section II.B of Defendants' brief sets out their argument as to why "Plaintiffs Did Not Receive the Required Number of Telephone Solicitations."

As to Plaintiff Smith, Defendants' Section II.B describes why Smith falls into two exceptions to the telephone solicitation definition—EBR and prior express invitation or permission. However, 47 C.F.R. § 64.1200(d) applies to calls made "for telemarketing purposes" and does not mention telephone solicitations. The regulations provide that telemarketing "means the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person." 47 C.F.R. § 64.1200(f)(12). Although this language parallels the definition of "telephone solicitation" in § 64.1200(f)(14), the telemarketing definition does not exclude calls made to a person with whom the caller has an EBR or has obtained prior express invitation or permission. *See Hamdan v. Rumsfeld*, 548 U.S. 557, 578 (2006) ("[A] negative inference may be drawn from the exclusion of language from one statutory provision that is included in other provisions of the same statute.") Beyond briefly referring back to their argument from Count III, Defendants make no argument as to why entities making calls pursuant to an EBR or with prior express invitation or permission would be exempt from maintaining internal do-not-call

35

procedures as required by 47 C.F.R. § 64.1200(d). *See Allard v. SCI Direct, Inc.*, No. 16-CV-01033, 2017 WL 2957883, at *6 (M.D. Tenn. July 10, 2017) (finding there is no consent exception to liability under of 47 C.F.R. § 64.1200(d), because "even if [defendant] only initiates telemarketing calls to customers who have given permission to receive such calls, it would still be required to maintain a do-not-call list to permit those customers to opt-out of getting telemarketing calls if they so desire.") Therefore, the Court finds Defendants' argument inapplicable here.

As to Plaintiff Kagarice, Defendants' Section II.B describes their argument that he has provided insufficient proof regarding the alleged calls before and after his message exchange with No Other Pub in April 2017. For the reasons discussed in Count III, the Court finds that a dispute of fact remains as to whether these calls occurred.

For the reasons discussed above, Defendants' motion for summary judgment as to both Plaintiffs on Count II is denied.

### d. COUNT IV: Revocation Claim

In Count IV, Plaintiff Kagarice alleges that Defendants violated 47 C.F.R. § 64.1200(d)(3) by sending multiple telemarketing messages to Kagarice within a twelve-month period after being asked to stop. As discussed above, 47 C.F.R. § 64.1200(d) provides that an entity may not "initiate any call for telemarketing purposes to a residential telephone subscriber unless such person or entity has instituted procedures for maintaining a list of persons who request not to receive telemarketing calls" by that entity. 47 C.F.R. § 64.1200(d). Subsections (d)(1) through (d)(6) go on to list "minimum standards" that these procedures must meet. Subsection (d)(3) provides that when an entity receives a do-not-call request from a recipient, the entity must record the request on an internal do-not call list and "must honor a residential

36

subscriber's do-not-call request within a reasonable time from the date such request is made." 47 C.F.R. § 64.1200(d)(3). Kagarice alleges that he made such a request, that it was not honored, and that therefore Defendants are liable for each violation of subsection (d)(3) independent of and in addition to their liability for their violations of subsection (d) as alleged in Count II.

Defendants assert that Count IV should be stricken as duplicative of Count II pursuant to Federal Rule of Civil Procedure 12(f). Rule 12(f) provides that the Court may on its own "strike from a pleading . . . any redundant . . . matter." Fed. R. Civ. P. 12. The Court may do so where a plaintiff alleges multiple claims premised on the same factual allegations and seeking the same relief. *See Schupp v. CLP Healthcare Servs., Inc.*, No. 2:12-CV-04262-NKL, 2013 WL 150291, at *1 (W.D. Mo. Jan. 14, 2013) (striking a claim as duplicative where plaintiff alleged two redundant claims—one that she was wrongfully discharged under the MHRA and one that she was discriminatorily terminated under the MHRA); *Ladd v. St. Louis Bd. of Police Comm'rs*, No. 405CV916UNA RHK/AJB, 2006 WL 2862165, at *5 (E.D. Mo. Oct. 4, 2006) (dismissing as redundant two claims based on the same factual predicate and resulting in the same constitutional injury as a third claim).

Subsection (d) of 47 C.F.R. § 64.1200 prohibits initiating telemarketing calls without first instituting procedures that meet certain "minimum standards," and (d)(3) is one in a list of six enumerated "minimum standards." A failure to honor a recipient's do-not-call request is a violation of the regulations only insofar as it potentially represents a failure to institute the minimum standards as described by § 64.1200(d). Therefore, Kagarice cannot recover for both Defendants' alleged failure to meet § 64.1200(d)'s minimum standards generally under Count II and in addition recover separately for Defendants' failure to meet (d)(3)'s specific minimum standard of honoring a recipient's do-not-call request. His § 64.1200(d)(3) claim in Count IV is

made pursuant to the same regulatory prohibition as his § 64.1200(d) claim in Count II and would necessarily be premised on the same factual basis—that Defendants initiated a telemarketing call without first instituting the "minimum standard" of honoring do-not-call requests. *See Buja v. Novation Capital, LLC*, No. 15-81002-CIV, 2017 WL 10398957, at *4 (S.D. Fla. Mar. 31, 2017) ("[I]n order to prove a subsection (d)(3) violation, a plaintiff cannot rely solely on the fact that a provider failed to record or honor an individual's request to be placed on a DNC list. Rather, the plaintiff must establish that the calls he or she received were initiated prior to the implementation of proper procedures."); *Simmons v. Charter Commc'ns, Inc.*, No. 3:15-CV-317 (SRU), 2016 WL 1257815, at *13 (D. Conn. Mar. 30, 2016) ("[T]he failure to record a DNC request is not itself a violation of subsection (d)(3). However, it could be used as evidence of a failure to implement proper procedures prior to the initiation of a call." (internal citation omitted)).

Although Kagarice asserts that Count IV is distinct from Count II, Kagarice has pointed to no authority, and the Court is aware of none, where a Defendant has been found liable for both a violation of 47 C.F.R. § 64.1200(d) and an independent violation of one of the "minimum standards" enumerated by that subsection. Rather, courts have viewed a failure to institute a procedure that meets the "minimum standards" as the operative violation of § 64.1200(d). For example, in *Nece v. Quicken Loans, Inc.*, a district court struck pursuant to Rule 12(f) a plaintiff's claim under 47 C.F.R. § 64.1200(d)(3) because it was duplicative of Plaintiff's additional claim under § 64.1200(d). No. 8:16-CV-2605-T-23TBM, 2017 WL 2865047, at *2 (M.D. Fla. Jan. 3, 2017). Similarly, in *Benzion v. Vivint, Inc.*, a district court rejected a plaintiff's argument that subsection (d)(3) provided a private right of action for receiving a phone call after asking defendant to stop that was independent of the requirements of subsection (d).

38

No. 12-61826-CIV, 2014 WL 11531368, at *5 (S.D. Fla. Jan. 17, 2014). The *Benzion* court

found that "Plaintiff's reliance on the language of subsection (d)(3) is misguided because the

enumerated 'minimum standards' are simply the guidelines that the telemarketer must have in

place before placing a call. Subsection (d)(3) does not create an independent cause of action

separate from § 64.1200(d)." *Id. See also Charvat v. GVN Michigan, Inc.*, 561 F.3d 623, 632

(6th Cir. 2009) (reviewing the language of 47 C.F.R. § 64.1200(d) and finding that "[t]he

'violation of the regulations' is [] the initiation of the phone call without having implemented the

minimum procedures.")

Therefore, because Kagarice's Count IV is redundant of his Count II, the Court strikes

Count IV pursuant to Rule 12(f). The Court need not address Defendants' remaining arguments

on this Count.

### e. Cordish Companies and ECI Liability

Finally, Defendants Cordish Companies and ECI move for summary judgment on all

claims against them on the ground that they cannot be held either directly or vicariously liable

for any conduct alleged against No Other Pub.[7] It is undisputed that neither Cordish Companies

nor ECI physically sent the messages at issue here; rather, the messages were physically sent by

No Other Pub. However, Plaintiffs still assert that both Cordish Companies and ECI can be held

---

[7] Cordish and ECI also briefly state that this Court lacks personal jurisdiction over them for the
same reasons stated in their motion to dismiss. The Court previously found that Defendants were
properly subject to personal jurisdiction at the motion to dismiss stage, *see Smith v. Truman Rd.
Dev., LLC*, 414 F. Supp. 3d 1205 (W.D. Mo. 2019), and Defendants have neither offered any
argument nor pointed to any facts or law in support of this assertion in their motion for summary
judgment. Therefore, the Court will not consider it. *See Milligan v. City of Red Oak*, 230 F.3d
355, 360 (8th Cir. 2000) (refusing to consider an assertion that was not supported by argument or
case law in the party's briefing); *Meyer v. Currie Tech Corp.*, 329 F.R.D. 228, 237 (D. Neb.
2018) (same).

directly liable, as they were so involved sending the calls as to be deemed to have initiated them. Alternatively, Plaintiffs argue that Cordish Companies and ECI can be held vicariously liable for No Other Pub given their level of control over No Other Pub's messaging campaigns.

### i. Direct Liability

Plaintiffs argue that ECI and Cordish Companies can be held directly liable for the text messages here, because while the entities did not physically press "send" to initiate the text messages, ECI and Cordish Companies were so involved in placing the calls that they should be deemed to have initiated them.

The TCPA's implementing regulations impose direct liability on a "person or entity" that "initiate[s]" a message in violation of the national do-not-call or internal do-not-call regulations. *See* 47 C.F.R. § 64.1200(c), (d). "[T]he FCC has concluded that 'a person or entity initiates a telephone call when it takes the steps necessary to physically place a telephone call'" and that "direct TCPA liability in this context generally does not extend to sellers who do not personally make the phone calls at issue, but only includes the telemarketers acting on behalf of those sellers." *Golan v. FreeEats.com, Inc.*, 930 F.3d 950, 960 (8th Cir. 2019) (quoting *In re Dish Network, LLC,* 28 F.C.C. Rcd. 6574, 6583 (2013)).

In *Golan*, the Eighth Circuit upheld a lower court's decision to refuse the plaintiff's proposed jury instruction on direct liability, because the proposed instruction "would have allowed the jury to find [the defendant] directly liable based on direct, personal participation, defined as 'active oversight of, or control over' the TCPA violation, or if he 'personally authorized' it. But to be held directly liable, a person must actually initiate the offending phone call, meaning the person takes the steps necessary to physically place a telephone call.'" *Golan v. FreeEats.com*, 930 F.3d at 961 (internal quotations omitted). Further, the Eighth Circuit found

that the evidence did not support an instruction on direct liability.  Although the Defendant "hired the direct violator, was involved in editing the call script, obtained [the individual who performed the voice-over on the call] to record the script, and approved and paid for the calls," this was insufficient for an instruction on direct liability.  *Id*.  "[W]hile such facts could show a significant level of control that might be sufficient to establish liability under an agency theory . . . they do not show [Defendant] actually initiated the calls. Only [the telemarketers], who made the calls at issue here, initiated the calls by 'taking the steps necessary to physically place the telephone calls.'"  *Id*.  (quoting *In re Dish Network, LLC*, 28 F.C.C. Rcd. at 6583).

Thus, under Eighth Circuit precedent in *Golan*, neither ECI nor Cordish Companies can be held directly liable, because only No Other Pub "initiated the calls by taking the steps necessary to physically place the [text messages]." *Id*.  Although the FCC has found that a non-caller can be held directly liable where it is "so involved in placing the calls as to be deemed to have initiated them,"  such as when a smartphone application entity "automatically sends invitational texts of its own choosing to every contact in the app user's contact list with little or no obvious control by the user," *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 30 F.C.C. Rcd. 7961, 7984 (2015), Defendants' alleged role here in orchestrating the text messaging campaigns is more analogous to the defendant's role in *Golan* and therefore direct liability is inapplicable.  Cordish Companies and ECI's motion for summary judgment as to direct liability is granted.

### ii.  Vicarious Liability

Alternatively, Plaintiffs assert that ECI and Cordish Companies can be held vicariously liable for No Other Pub's conduct.  "'When Congress creates a tort action, it legislates against a legal background of ordinary tort-related vicarious liability rules,' and such background legal

41

principles apply unless the statute's text or context indicate otherwise." *Golan v. FreeEats.com*, 930 F.3d at 961 (quoting *Meyer v. Holley*, 537 U.S. 280, 285, 123 S.Ct. 824, 154 L. Ed. 2d 753 (2003)). "[A] defendant may be held vicariously liable for TCPA violations where the plaintiff establishes an agency relationship, as defined by federal common law, between the defendant and a third-party caller." *Gomez v. Campbell-Ewald Co.*, 768 F.3d 871, 877–79 (9th Cir. 2014), aff'd 136 S.Ct. 663 (2016). "Federal common law is in accordance with the Restatement of Agency." *Golan v. Veritas Entm't, LLC*, No. 4:14CV00069 ERW, 2016 WL 880402, at *4 (E.D. Mo. Mar. 8, 2016).

Plaintiffs do not specify which theory of vicarious liability they believe Defendants may be held liable under here.[8] Rather, the parties focus their dispute on whether there is sufficient evidence to find a principal/agent relationship exists at all.

"Agency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." Restatement (Third) Of Agency § 1.01 (2006); *see also S. Pac. Transp. Co. v. Cont'l Shippers Ass'n, Inc.*, 642 F.2d 236, 238 (8th Cir. 1981) ("Agency is a legal concept that depends upon the existence of certain factual elements: (1) the manifestation by the principal that the agent shall act for him; (2) the agent's acceptance of the undertaking; and (3) the understanding of the parties that the principal is to be in control of the undertaking"). "A relationship is not one of agency within the common-law definition unless the agent consents to act on behalf of the

---

[8] Under the TCPA, a principal may be held liable under a "broad range of agency principles, including not only formal agency, but also principles of apparent authority and ratification." *In the Matter of the Joint Petition Filed by Dish Network, LLC*, 28 F.C.C. Rcd. 6574, 6584 (2013).

principal, and the principal has the right throughout the duration of the relationship to control the agent's acts." Restatement (Third) Of Agency § 1.01 (2006).

"Normally the existence or nonexistence of a principal-agent relationship is a fact question left to the trier of fact. It is only where the facts are not in dispute and there is no real issue for the jury to resolve that the trial court should rule on the agency issue as a matter of law." *Waterhout v. Associated Dry Goods, Inc.*, 835 F.2d 718, 720 (8th Cir. 1987). *See also Northern v. McGraw-Edison Co.*, 542 F.2d 1336, 1343 (8th Cir. 1976) ("Since [the agency] determination requires the finding and weighing of numerous facts, the ultimate resolution is appropriately left to the province of the jury in most instances.")

Defendants first assert that there can be no vicarious liability here because there is "no evidence of control to support an agency relationship." Doc. 146 (Defendants Suggestions in Support of Motion for Summary Judgment), p. 25. "In the TCPA context, courts characterize the control necessary to establish agency as whether the principal 'controlled or had the right to control the agent and, more specifically, the manner and means of the text message campaign they conducted.'" *Wilson v. PL Phase One Operations L.P.*, No. CV DKC 18-3285, 2019 WL 4735483, at *4 (D. Md. Sept. 27, 2019) (quoting *Thomas v. Taco Bell Corp.*, 879 F.Supp.2d 1079, 1084 (C.D. Cal. 2012), aff'd, 582 F.App'x 678 (9th Cir. 2014)).

As to ECI's control over No Other Pub's messaging activity, viewing the facts in the light most favorable to Plaintiffs, a reasonable jury could find ECI controlled the manner and means of the text messaging campaigns here. ECI set and enforced No Other Pub's marketing policies and practices and developed district-wide policies for how, when, and with what phrasing text messages were permitted to be sent by No Other Pub and other Kansas City Power & Light venues, including by providing the data collection forms and messaging platform. *See* Doc. 179-

43

8; Doc. 179-14; Doc. 179-4, pp. 41–45. ECI specifically developed Txt Live with a software development company for venues' use. Doc. 179-7; Doc. 179-9 (ECI Txt Live Invoices). ECI then developed and oversaw the implementation and continued usage of the Txt Live program, including creating extensive usage guidelines for crafting messages that were most likely to elicit a response and avoid being flagged as a spam message by common carriers. *See* Doc. 179-11; Doc.179-12; Doc. 179-13; Doc. 179-14; Doc. 179-15; Doc. 152-24. ECI was in consistent contact with venues including No Other Pub and was able to monitor and bar venues' access to the platform. Doc. 179-17. In essence, each aspect of No Other Pub's use of Txt Live was in some way directed by ECI. Viewing all facts and drawing all inferences in Plaintiff's favor, a reasonable jury could find No Other Pub was acting subject to the ECI's control with respect to its messaging activity. *See Golan v. Veritas Entm't, LLC*, No. 4:14CV00069 ERW, 2017 WL 2861671, at *10 (E.D. Mo. July 5, 2017) (where the calls at issue were to publicize a movie, plaintiffs demonstrated a dispute of fact regarding defendant's vicarious liability where they presented evidence that defendant edited the script, oversaw marketing for the movie, recruited the voiceover creator, and was the authority for implementation of the telemarketing scheme); *Mey v. Venture Data, LLC*, 245 F. Supp. 3d 771, 787 (N.D.W. Va. 2017) (principal maintained "substantial control" where principal wrote scripts for agent, developed code for agent's survey software, shared access to databases, worked with agent's calling teams including being consistently in touch and helping troubleshoot survey problems, provided numbers to call, and monitored calling data).

Plaintiffs also present evidence to support the inference that Cordish Companies exerted control over No Other Pub's messaging campaign, although to a lesser degree than ECI. Cordish Companies Principal Reed Cordish is also President of ECI and participated in the marketing

44

campaigns by recommending a guide for data collection to Kansas City venues as well as the

selection of a new text messaging platform vendor in 2015.  Doc. 179-7; Doc. 179-8.  Individuals

at Cordish Companies also oversaw through ECI and Kansas City Power & Light the marketing

programming at No Other Pub.  Doc. 179-5, pp. 16–17; Doc. 179, p. 9; Doc. 84-1, Ex. H, pp.

55–56.  Cordish Companies individuals also analyzed messaging data from Kansas City, were

apprised of progress with data collection trainings and meetings, were in daily communication

with the Marketing Manager for KC Live!, and would request certain sales promotions for the

venues to implement.  Doc. 179-5, pp. 16–17; Doc. 84-1, Ex. H, pp. 55–56; Doc. 152-26; Doc.

152-20.

Defendants argue Cordish Companies could not exert control over No Other Pub because

it conducts no business operations.  Defendants offer an affidavit from an attorney with CTR

Management, Inc., a real estate development services corporation that works with Cordish

properties, stating that Cordish Companies "conducts no business or operations, has no

employees and does not own any property."  Doc. 146-19.  However, the evidence presented by

Plaintiffs and discussed above places this in dispute.  The dispute is further underlined by

statements on the Cordish Companies' website www.Cordish.com stating it owns and manages

Kansas City Power & Light and KC Live! out of its Kansas City office despite its disclaimer

stating otherwise.  Viewing all facts and drawing all reasonable inferences in Plaintiff's favor, a

reasonable jury could conclude from this evidence that through Reed Cordish's policy

dissemination and involvement with the messaging platform vendor selection, Cordish

Companies individuals' oversight of Kansas City Power & Light marketing activity, as well as

Cordish Companies' placement of its marketing and management staff in positions of authority

at ECI in the Kansas City Power & Light District and statement that it manages KC Live! out of its Kansas City office, that No Other Pub was acting subject to the Cordish Companies' control.

Defendants next argue that a second element of the agency relationship is absent here, because "[t]here is no evidence that No Other Pub was acting 'on behalf of' either ECI or Cordish, given that the text messages said nothing about either entity and explicitly related to events at No Other Pub." Doc. 146, pp. 19–20. "The common-law definition of agency requires as an essential element that the agent consent to act on the principal's behalf, as well as subject to the principal's control." Restatement (Third) Of Agency § 1.01 (2006).

Defendants are correct that No Other Pub's text messages do not explicitly mention ECI or Cordish Companies. However, Defendants' argument misses the full picture of the relationship among Cordish Companies, ECI, and No Other Pub that a reasonable jury could infer from Plaintiffs' evidence. Viewing all facts and drawing all inferences in the light most favorable to Plaintiffs, Cordish Companies developed the Kansas City Power & Light entertainment district and created ECI in order to implement a uniform marketing scheme among all of the district's venues. Cordish Companies Principal Reed Cordish then, from the top down, approved the uniform policies on how each of these venues should draw business to the district by text messaging customers using the messaging platform that he had helped select. Individuals associated with Cordish Companies analyzed messaging campaigns to determine which campaigns were performing well, and they were placed in leadership roles at ECI in Kansas City Power & Light, leading to uniform text message campaign policies across the venues. When Cordish Companies and ECI decided to transition away from a former messaging system, ECI then contracted with a software developer to create a new software and granted access to all Kansas City Power & Light venues for use. Although ECI claims all the venues reimbursed ECI

46

for this use, ECI did not produce any documentation to Plaintiffs during discovery. A reasonable

jury could conclude that by adhering to the Kansas City Power & Light marketing scheme using

messaging systems provided free of cost by ECI while under the supervision of Cordish

Companies and ECI, No Other Pub had "consent[ed] to act on the principal's behalf" to draw

business to the Kansas City Power & Light district. Restatement (Third) Of Agency § 1.01

(2006). *See Montague v. Heater*, 836 F.2d 422, 425 (8th Cir. 1988) (rejecting a principal's

argument that the agent acted "solely on his own behalf and acted independently throughout"

where there was evidence that the agent split profits with the principal and indicated he would

need to consult with the principal before making the sale, among other factors); *In re*

*Monitronics Int'l, Inc., Tel. Consumer Prot. Act Litig.*, No. 1:13-MD-2493, 2019 WL 7835630, at

*4 (N.D.W. Va. Apr. 3, 2019) ("Where the purpose of telemarketing calls is to increase the flow

of consumers to multiple businesses, then all of those businesses are 'sellers' under the TCPA");

*Aranda v. Caribbean Cruise Line, Inc.*, 179 F. Supp. 3d 817, 833 (N.D. Ill. 2016) (holding that a

reasonable jury could find an agency relationship where one defendant company that was not

advertised on the telemarketing calls authorized a subagent second company to seek out leads

and to authorize a third company to communicate vacation offers in a call campaign that would

eventually create business for the first company); *Kristensen v. Credit Payment Servs.*, 12 F.

Supp. 3d 1292, 1302 (D. Nev. 2014) (plaintiff sufficiently alleged an agency relationship where

"there was a 'downhill' series of contractual relationships starting with the Lender Defendants

down through Click Media, and the benefits of the text message (leads for potential payday

lending customers) flowed back 'uphill' through Click Media and LeadPile to the Lender

Defendants.")

Defendants cite to *Jones v. Royal Administration Services, Inc.*, 887 F.3d 443 (9th Cir. 2018) to support their argument, but *Jones* is distinguishable. In *Jones*, the Ninth Circuit found a seller could not be vicariously liable for the activity of its hired telemarketer where the telemarketer kept records and provided reports to the seller, collected payments for the seller, was required by the seller to operate lawfully, and used the seller's scripts when discussing the seller's products with consumers. *Id.* at 451. However, in *Jones*, the telemarketers were hired to sell for a number of entities, and there was "no evidence that [the telemarketer defendants] ever tried to sell [the seller defendant's product] to plaintiff" and therefore the seller defendant "never specifically controlled any part of any of the calls at issue in this case." *Id.* at 451. Furthermore, there was a lesser degree of oversight in *Jones* than here, because the seller defendant only visited the call center one dozen times over three years, whereas ECI and Cordish Companies had staff working out of the Kansas City Power & Light District who were in consistent contact with venues, including regular marketing strategy and policy dissemination meetings. *See, e.g.*, Doc. 179-16; Doc. 179-17; Doc. 179-5. The Ninth Circuit also found as determinative that the telemarketers provided their own equipment, yet Plaintiffs here have offered proof that Cordish Companies participated in selecting and ECI provided the data collection methods that venues used to collect the information and allowed venues to use ECI's messaging platform. These facts distinguish this case from *Jones* such that conflicting inferences may be drawn, making the issue inappropriate for summary judgment.

"[W]hen the facts pertaining to the existence of an agency are conflicting, or conflicting inferences may be drawn from the evidence, the question is one of fact for the jury." *Am. Prairie Const. Co. v. Hoich*, 560 F.3d 780, 793 (8th Cir. 2009) (internal quotations omitted). While the evidence is not overwhelming, when viewing all facts and drawing all reasonable inferences in a

48

light most favorable to Plaintiffs, they have presented sufficient evidence that, when characterized properly, would permit a reasonable jury to find ECI and Cordish Companies vicariously liable for the text messages here.[9] Cordish Companies and ECI's motion for summary judgment as to their vicarious liability is denied.

## III.    MOTION TO EXCLUDE EXPERT REPORT

Defendants have moved to exclude the expert opinion of Plaintiffs' expert Dr. Michael Shamos.  Doc. 141.  Dr. Shamos' expert report reviews the functionality and operation of the Txt Live platform.  *See* Doc. 152-9 (Substitute Expert Report of Dr. Michael Shamos); Doc. 152-31 (Rebuttal Expert Report of Dr. Michael Shamos).  As discussed above, the material facts related to the core functionality of the Txt Live platform are undisputed.  Plaintiffs admit that the platforms do not have the capacity to generate random or sequential phone numbers.  Therefore, the Court need not reach Defendants' Motion to Exclude the Expert Opinion of Dr. Shamos, and it is denied as moot.  *See Smith v. Premier Dermatology*, No. 17 C 3712, 2019 WL 4261245, at *7 (N.D. Ill. Sept. 9, 2019) (denying as moot defendant's motion to exclude expert report where

---

[9] Although decided at the motion to dismiss stage, a Maryland district court's review of a plaintiff's analogous allegations against ECI and Cordish for their use of Txt Live supports the Court's determination here:

> The complaint sets forth an agency relationship among the Defendants. At the top, Cordish wields say over any day-to-day operating decisions, including those regarding advertising, while ECI implements the advertising strategies to the various entities at base. Further, Plaintiffs specifically allege that Cordish and ECI are responsible for TXT Live! ECI developed the policies and procedures for creating text messaging campaigns and collecting lists of consumers' names and phone numbers for use in telemarketing campaigns, while Cordish gives final approval over marketing, lists TXT Live! as one of its primary assets, and owns the domain names associated with TXT Live!

*Wilson v. PL Phase One Operations L.P.*, No. CV DKC 18-3285, 2019 WL 4735483, at *5 (D. Md. Sept. 27, 2019) (internal citations omitted).

49

the material facts related to the messaging platform's functionality were undisputed); *Thompson-Harbach*, 359 F. Supp. 3d at 633 (same).

## IV.    MOTION FOR CLASS CERTIFICATION

Corresponding to Count I of his Second Amended Complaint alleging violations of the TCPA's prohibition against using an ATDS, Plaintiff Smith seeks to certify the following class:

- All individuals who provided their phone number to No Other Pub on a sign-in sheet and who received a text message from No Other Pub.

As discussed, the Court has granted summary judgment to Defendants on Count I. Therefore, Plaintiff Smith's motion to certify a class based on this claim is now moot, and the Court will deny the motion.   *See Toben v. Bridgestone Retail Operations, LLC*, 751 F.3d 888, 896 (8th Cir. 2014) ("The Eighth Circuit has affirmed grants of summary judgment before class certification.  Rule 23's Advisory Committee Notes similarly permit summary judgment rulings before class certification." (internal citations omitted)); *Hechenberger v. W. Elec. Co.*, 742 F.2d 453, 455 (8th Cir. 1984) ("The normal rule is that when claims of the named plaintiffs are moot before class certification dismissal of the action is required."); *Marx v. Centran Corp.*, 747 F.2d 1536, 1552 (6th Cir. 1984) ("To require notice to be sent to all potential plaintiffs in a class action when the underlying claim is without merit is to promote inefficiency for its own sake.")

## V.  CONCLUSION

For the reasons discussed above, Plaintiffs' motion for partial summary judgment is denied.  Defendants' motion for summary judgment is granted in part and denied in part.  Defendants' motion to exclude expert testimony is denied.  Plaintiff Smith's motion for class certification is denied.

s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated:  April 28, 2020
Jefferson City, Missouri